**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

TRANSPORTATION TRADES DEPARTMENT, AFL-CIO,

815 16th Street, NW, 4th Floor
Washington, D.C. 20006

AIR LINE PILOTS ASSOCIATION INTERNATIONAL,

1625 Massachusetts Ave., NW., 8th Floor
Washington D.C. 20036

AMERICAN TRAIN DISPATCHERS ASSOCIATION,

4239 W. 150th Street
Cleveland, OH 44135

ASSOCIATION OF FLIGHT ATTENDANTS-CWA,

501 Third Street, NW, 9th Floor
Washington, D.C. 20001-2797

BROTHERHOOD OF LOCOMOTIVE ENGINEERS AND TRAINMEN DIVISION/IBT RAIL CONFERENCE,

7061 East Pleasant Valley Road
Independence, OH 44131

BROTHERHOOD OF MAINTENANCE OF WAY EMPLOYES DIVISION / IBT,

41475 Gardenbrook Road
Novi, MI 48375-1328

BROTHERHOOD OF RAILROAD SIGNALMEN,

917 Shenandoah Shores Road
Front Royal, VA 22630

COMMUNICATIONS WORKERS OF AMERICA,

501 Third Street, NW, 6th Fl. Legal Department
Washington, D.C. 20001

Case No. ____________

INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS,

9000 Machinists Place
Upper Marlboro, MD 20772

INTERNATIONAL ASSOCIATION OF SHEET METAL, AIR, RAIL AND TRANSPORTATION WORKERS (SMART) – MECHANICAL DIVISION

1750 New York Avenue, NW, 6th Floor
Washington, D.C. 20006

INTERNATIONAL ASSOCIATION OF SHEET METAL, AIR, RAIL AND TRANSPORTATION WORKERS (SMART) – TRANSPORTATION DIVISION

24950 Country Club Boulevard, Ste. 340
North Olmsted, OH 44070

INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS,

900 Seventh Street, NW
Washington, D.C. 20001

NATIONAL CONFERENCE OF FIREMEN & OILERS DISTRICT OF LOCAL 32BJ, SEIU

1212 Bath Avenue, Floor F&O
Ashland, KY 41101

TRANSPORT WORKERS UNION OF AMERICA, and

501 3rd Street NW, 9th Floor
Washington D.C. 20001

TRANSPORTATION COMMUNICATIONS UNION - IAM,

3 Research Place
Rockville, MD 20850

Plaintiffs,

v.

NATIONAL MEDIATION BOARD,

1301 K St., NW, Suite 250 East
Washington, D.C. 20005

Defendant.

**COMPLAINT**

Plaintiffs the Transportation Trades Department of the AFL-CIO, Air Line Pilots Association International, American Train Dispatchers Association, Association of Flight Attendants-CWA, Brotherhood of Locomotive Engineers and Trainmen Division/IBT Rail Conference, Brotherhood of Maintenance of Way Employes Division/ IBT, Brotherhood of Railroad Signalmen, Communications Workers of America, International Association of Machinists and Aerospace Workers, International Association of Sheet Metal, Air, Rail and Transportation Workers (SMART) – Mechanical Division, SMART –Transportation Division, International Brotherhood of Electrical Workers, National Conference of Firemen & Oilers District of Local 32BJ, SEIU, Transport Workers Union of America, and Transportation Communications Union – IAM ("Plaintiffs" herein) by and through undersigned counsel, bring this action against Defendant the National Mediation Board and allege as follows:

1. This is an action to prevent the National Mediation Board ("NMB" or "Board") from applying a Final Rule regarding "Decertification of Representatives," adopting a new decertification procedure including an unjustified two-year moratorium on employees seeking alternative union representation after decertifying their current representative, which is in gross

violation of the Railway Labor Act, 45 U.S.C. § 151, *et seq.* as well as an arbitrary and capricious departure from long-standing Board practice.

2. The NMB has exclusive jurisdiction to resolve representation disputes in the air and rail transportation industries. But Congress has expressly limited the circumstances in which the Board may exercise that jurisdiction. It may only do so at the request of employees, and it may only act when an individual or organization seeks to be "certified as the representative of … employees." 45 U.S.C. § 152, Twelfth. Absent such an application, Congress has instructed that the Board "shall not direct an election or use any other method to determine who shall be the representative." 45 U.S.C. § 152, Twelfth. In contravention of this express limit on its jurisdiction, and in an abrupt deviation from over 80 years of past practice, the Board in a Final Rule issued on July 26, 2019 now claims authority to direct an election based on an application by any employee seeking exclusively to "decertify" an existing representative. *See* 84 Fed. Reg. 35989 (July 26, 2019) (to be codified at 29 C.F.R. pts. 1203 & 1206). This action is in excess of the Board's limited jurisdiction and is a "gross violation" of the Railway Labor Act and should be enjoined. *See Ry. Labor Execs.' Ass'n v. Nat'l Mediation Bd.*, 29 F.3d 655, 659 (D.C. Cir. 1994) (*en banc*).

3. The Board's Final Rule also provides that, following a decertification, employees are prohibited from seeking an election for a new representative for a two-year period. *See* 84 Fed. Reg. 35989 (July 26, 2019) (to be codified at 29 C.F.R. 1206.4). This new and extraordinary limitation on employee's statutory rights is wholly unjustified by the Board, and is twice as long as the existing limits on representation elections following an effective loss of representation under the Board's long-standing prior procedures. This aspect of the Final Rule is arbitrary and capricious.

## JURISDICTION AND VENUE

4. This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

5. Venue is proper in this District pursuant to 28 U.S.C. § 1391(e).

6. The questions presented in the Complaint were raised by the Transportation Trades Department, AFL-CIO ("TTD"), its member organizations, and other labor organizations, including many of the Plaintiffs herein, with the NMB in the course of the formal rulemaking proceeding at issue here. The NMB issued the final rule on July 26, 2019, which became effective on August 26, 2019. *See* 84 Fed. Reg. 35977. The questions presented here are now fit for judicial review.

## PARTIES

7. Plaintiff TTD is the transportation umbrella organization for the AFL-CIO. TTD has 32 affiliated unions representing employees in all modes of transportation, including hundreds of thousands of railroad and airline employees covered by the Railway Labor Act ("RLA").[1]

---

[1] TTD's affiliates are: Air Line Pilots Association (ALPA); Amalgamated Transit Union (ATU); American Federation of Government Employees (AFGE); American Federation of State, County and Municipal Employees (AFSCME); American Federation of Teachers (AFT); American Train Dispatchers Association (ATDA); Association of Flight Attendants-CWA (AFA-CWA); Brotherhood of Railroad Signalmen (BRS); Communications Workers of America (CWA); International Association of Fire Fighters (IAFF); International Association of Machinists and Aerospace Workers (IAM); International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers (IBB); International Brotherhood of Electrical Workers (IBEW); International Longshoremen's Association (ILA); International Organization of Masters, Mates & Pilots (MM&P); International Union of Operating Engineers (IUOE); International Union, United Automobile, Aerospace and Agricultural Implement Workers of America; Laborers' International Union of North America (LIUNA); Marine Engineers' Beneficial Association (MEBA); National Air Traffic Controllers Association (NACTA); National Association of Letter Carriers (NALC); National Conference of Firemen and Oilers, SEIU (NCFO, SEIU); National Federation of Public and Private Employees (NFOPAPE); Office and Professional Employees International Union (OPEIU); Professional Aviation Safety Specialists (PASS); Sailors' Union of the Pacific (SUP); Sheet Metal, Air, Rail and Transportation Workers (SMART); Smart-Transportation Division; Transport Workers Union of America (TWU);Transportation Communications Union (TCU);Unite Here; United Automobile,

8. Plaintiff Air Line Pilots Association, International is the largest airline pilot union in the world, representing over 63,000 pilots at 35 U.S. and Canadian airlines. The Association is chartered by the AFL-CIO and the Canadian Labour Congress.

9. Plaintiff American Train Dispatchers Association ("ATDA") is an unincorporated labor organization that maintains its headquarters in Cleveland, Ohio. ATDA is the duly designated collective bargaining representative under Section 1, Sixth of the RLA, 45 U.S.C. § 151, Sixth, for railroad employees working in the craft or class of train dispatchers on most of the nation's freight railroads, Amtrak, and commuter railroads.

10. Plaintiff Association of Flight Attendants-CWA is a labor organization which represents nearly 50,000 flight attendants at twenty different air carriers throughout the United States.

11. Plaintiff Brotherhood of Locomotive Engineers and Trainmen Division/IBT Rail Conference ("BLET") is an unincorporated labor organization that maintains its headquarters in Independence, Ohio. BLET is the duly designated collective bargaining representative under Section 1, Sixth of the RLA, 45 U.S.C. § 151, Sixth, of locomotive engineers and other operating craft railroad employees working for the nation's freight railroads, Amtrak, and commuter railroads.

12. Plaintiff Brotherhood of Maintenance of Way Employes Division/IBT ("BMWED") is an unincorporated labor association that maintains its headquarters in Novi, Michigan. The BMWED is the duly designated representative for collective bargaining under Section 1, Sixth of the RLA, 45 U.S.C. § 151, Sixth, of railroad employees working in the craft or class of

---

Aerospace and Agricultural Implement Workers of America (UAW);United Mine Workers of America (UMWA); and United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union (USW).

maintenance of way employees, including maintenance of way employees employed by freight railroads, Amtrak, and commuter railroads.

13. Plaintiff Brotherhood of Railroad Signalmen ("BRS") is an unincorporated labor organization that maintains its headquarters in Front Royal, Virginia. The BRS is the duly designated representative for collective bargaining under Section 1, Sixth of the RLA, 45 U.S.C. § 151, Sixth, of railroad employees working in the craft or class of Signalman, including Signalmen employed by freight railroads, Amtrak, and commuter railroads.

14. Plaintiff Communications Workers of America is an international labor union representing over 700,000 workers in a broad range of industries, including thousands of airline customer service agents covered by the RLA.

15. Plaintiff International Association of Machinists and Aerospace Workers ("IAM") is an international labor organization representing approximately 150,000 workers in the airline and railroad sectors. It represents employees at every major airline, except Delta. The IAM represents workers at over 25 different carriers and fixed base operators in every classification, except pilots, as well as machinists employed by every Class I Railroad, Amtrak, and many commuter rails throughout the United States.

16. Plaintiff International Association of Sheet Metal, Air, Rail and Transportation Workers ("SMART")-Mechanical Division is a division of an unincorporated labor association that maintains its headquarters in Washington, D.C. SMART-Mechanical Division is the duly designated representative for collective bargaining under Section 1, Sixth of the RLA, 45 U.S.C. § 151 Sixth, of railroad employees working in the craft or class of sheet metal worker, including sheet metal workers employed by freight railroads, Amtrak, and commuter railroads.

17. Plaintiff SMART-Transportation Division, formerly United Transportation Union, is the duly authorized representative for the purposes of the RLA of the crafts or classes of train service employees employed by the nations Class I railroads and others, and is a “representative” as defined by Section 1, Sixth of the RLA, 45 U.S.C. § 151 Sixth.

18. Plaintiff International Brotherhood of Electrical Workers is a labor organization that represents the craft or class of electrical workers on all of the nation’s major freight and passenger rail carriers.

19. National Conference of Firemen & Oilers District of Local 32BJ, SEIU (“NCFO”), is an unincorporated labor organization that maintains its headquarters in Ashland, Kentucky. NCFO is the duly designated collective bargaining representative under Section 1, Sixth of the RLA, 45 U.S.C. § 151, Sixth, of employees working as shop laborers for the nation’s freight railroads, Amtrak, and commuter railroads.

20. Plaintiff Transport Workers Union of America is a labor organization that represents more than 150,000 members across the airline, railroad, transit, university, utility and service sectors, including mechanics, fleet service clerks, dispatchers, car cleaners, baggage handlers, ramp agents, flight attendants, customer service representatives, and maintenance workers.

21. Plaintiff Transportation Communications Union – IAM is a labor organization representing approximately 46,000 members in the United States, primarily in the railroad industry.

22. Defendant the National Mediation Board (“NMB” or “the Board”) is an independent agency of the United States Government. As is relevant to this action, the NMB has the duty to investigate disputes as to the identity of employees’ representatives in the airline and rail

industries, subject to the specific jurisdictional limits established by Congress. 45 U.S.C. § 152, Ninth, Twelfth.

**STATUTORY AND REGULATORY BACKGROUND**

23. Labor relations in the airline and rail industries are governed by the Railway Labor Act, 45 U.S.C. §§ 151-188 ("RLA" or "the Act"). One of the stated purposes of the Act is "to forbid any limitation upon freedom of association among employees or any denial … of the right of employees to join a labor organization." 45 U.S.C. § 151a(2).

24. The Board has exclusive jurisdiction to resolve "disputes as to [the] identity of representatives" of employees covered by the Act. 45 U.S.C. § 152, Ninth.

25. While the Board has wide discretion to use any appropriate method to investigate and resolve a representation dispute, Congress has carefully limited the circumstances in which the Board may exercise that discretion. The Board may only initiate such an investigation "upon request" of a "party to the dispute" –that is, employees of a rail or air carrier. It may not do so at the instigation of an employer, nor may it do so *sua sponte*. 45 U.S.C. § 152, Ninth. Moreover, the Board "shall not direct an election or use any other method to determine who shall be the representative" of employees, unless it has first received "an application requesting that an organization or individual be certified as the representative" *and* such "application is supported by a showing of interest from not less than 50 percent of the employees in the craft or class." 45 U.S.C. § 152, Twelfth.

26. Federal courts have repeatedly admonished the Board that it has a limited statutory authority confined to the matters expressly authorized by the Act. As the *en banc* D.C. Circuit wrote, "the Board has no freewheeling authority to act as it sees fit with respect to anything denoted a 'representation dispute.' The Board's authority is exclusive *only* with respect to the

precise matters delimited" by the Act. *Ry. Labor Execs.' Ass'n v. Nat'l Mediation Bd.*, 29 F.3d 655, 662 (D.C. Cir. 1994) (*en banc*) (emphasis provided).

## FACTS

### Prior Procedures for Changing or Ending Union Representation

27. "[T]he Railway Labor Act spells out no procedures for … decertification and, for that matter, makes no mention of decertification procedures, much less requires them." *Air Transp. Ass'n of Am. v. Nat'l Mediation Bd.*, 663 F.3d 476, 485 (D.C. Cir. 2011). As the Court of Appeals for the Fifth Circuit observed in 1983, "the Board has stated time and time again" that a direct "decertification vote … is not allowed by the [Railway Labor] Act." *Russell v. Nat'l Mediation Bd.*, 714 F.2d 1332, 1342 (5th Cir. 1983).

28. Under the NMB's prior procedures, employees could effectively decertify an incumbent union. The Act and existing Board rules require that a representation application be submitted by an organization or individual supported by a 50 percent showing of interest. Once the showing is made, the Board conducts an election with the following ballot choices: the incumbent union; the applicant organization or individual; a write-in option; and a "no representation" option. If the applicant organization or individual receives a majority of the votes cast, then the Board certifies the applicant, effectively decertifying the incumbent union. Where the applicant is an individual who has publicly indicated that he or she will disavow certification if he or she prevails, this person is commonly referred to as a "straw man." If elected, the straw man then disavows representation.

29. Additionally, employees may become unrepresented if the "no representation" option prevails in the election.

30. Employees regularly invoked the NMB's current procedures either to elect a new representative or become unrepresented. The frequency of such applications belies any claim that the Board's current procedures are confusing or unwieldy. For example, in May 2018, the Board conducted an election among 551 employees at Flight Options/FlexJet in response to an application filed by an individual. In the election, the "no representation" option prevailed, resulting in one of the largest decertification votes in the Board's history. *Flight Options/FlexJet*, 45 N.M.B. 95 (2018).

31. Similarly, in February 2018, the NMB conducted an election among 424 employees at Kalitta Air in response to an application from an individual. As a result of the election, employees changed their representative by selecting a different organization using the Board's write-in option. *Kalitta Air*, 45 N.M.B. 21 (2018).

32. Overall, since 1998, a total of 43 individuals have filed representation-applications with the Board, presumably for the purpose of acting in a straw man capacity. In 27 of those matters, the incumbent union representative was effectively decertified, either through certification of the individual or an election resulting in no representative.

33. Since 1998, 51 small unaffiliated organizations have filed representation actions with the Board. In 11 of these matters, the election triggered by the application resulted in no representative being certified. In another 19 such cases, the incumbent union was decertified when the small organization was certified in its place.

**The Board's Past Rejection of**
**Employer Requests to Adopt Direct Decertification**

34. Employer groups have repeatedly petitioned the NMB to adopt express decertification procedures. The Board has formally considered adopting such procedures on at least two prior occasions –in 1987 and again in 2010. After careful consideration (including an extensive fact-

finding proceeding in 1987), the NMB rejected those past petitions explaining that its existing procedures were consistent with the RLA and sufficient to ensure employee choice in representation matters.

35. In the 1987 *Chamber of Commerce* proceeding, the Board emphasized that it "amends its rules only when *required* by statute or when essential for administrative purposes. Therefore, where there is a question of the Board's statutory authority to amend its rules to include decertification procedures, the standard of persuasion on behalf of the moving party must be very high." *Chamber of Commerce*, 14 N.M.B. 347, 356-357 (1987) (emphasis in original). The Board concluded the high standard of persuasion was not satisfied, finding the proponents of additional decertification procedures "failed to establish that formal decertification rules are essential to the well-ordered management of the Board's representation function" particularly in light of the fact that the Board had "two procedures whereby employees may become unrepresented." *Id.* at 358.

36. Again, in 2010 as part of the rulemaking process leading to the Board's adoption of a ballot including a "no representation" option, the National Right to Work Committee and several employers asserted that the Board should adopt formal decertification procedures. As in the past, the NMB explained that the RLA, unlike the National Labor Relations Act, was never amended by Congress to include a specific provision for decertification. 75 Fed. Reg. 26078 (May 11, 2010). The NMB also concluded that "the Board's existing election procedures allow employees to rid themselves of a representative." *Id*. The Board further explained that the adoption of the yes/no ballot would actually allow employees to cast a vote in favor of "no union:"

> Under current election procedures, there is no opportunity to vote "no" or against representation entirely. Employees who want to vote "no" must instead abstain from voting. The proposed change will give these employees the opportunity to affirmatively cast a ballot for "no union."

75 Fed. Reg. 26078-79.  Thus, the Board's adoption of the yes/no ballot provided further justification for rejecting the proposal for a separate decertification procedure.

**Congress Amends the RLA in 2012 and Bars Direct Decertification Procedures**

37. If there ever was any question whether the Railway Labor Act allowed for a direct decertification procedure, Congress closed the door to that option in 2012.  After the Board declined to create "direct" decertification procedures in 2010, and after the D.C. Circuit held that no such procedures were called for under the Act, Congress amended the Act in 2012.  Crucially, Congress did not require any decertification procedures in those amendments, but instead adopted language that specifically precludes the rule change challenged here.

38. The 2012 Amendments added a new Section 2, Twelfth to the Act, addressing the "Showing of interest for representation elections," and provided an additional statutory limit on the Board's authority to oversee representation determinations.  45 U.S.C. § 152, Twelfth.

39. That new section provided, for the first time, a congressional mandate regarding the threshold an application must meet before a representation election may be held.  It also specifically prohibited the Board from "us[ing] any … method to determine who shall be the representative of … [a] craft or class," unless it has first received "*an application requesting that an organization or individual be certified as the representative*."  45 U.S.C. § 152, Twelfth (emphasis provided).  This "application" must be "supported by a showing of interest from not less than 50 percent of the employees in the craft or class."  *Id.*  The Board is specifically precluded from using any method to determine representation unless there is an application seeking certification of a representative.

40. Congress was well aware in 2012 of disputes over decertification under the RLA and decided to specifically preserve the status quo pending further investigation.  Congress added a new Section 15 to Title I of the Act to require an "Immediate Review of Certification

Procedures." FAA Modernization and Reform Act of 2012, Pub. L. No. 112-95, § 1004, 126 Stat. 11, 147-48 (2012) ("Oversight"). Congress directed the Comptroller General to promptly "review the processes applied by the Mediation Board to certify or decertify representation of employees by a labor organization and make recommendations to the Board and appropriate congressional committees regarding actions that may be taken by the Board or Congress to ensure that the processes are fair and reasonable for all parties." *Id.* The Government Accountability Office promptly carried out its mission and made no recommendation that any action needed to be taken by either the Board or Congress.

**The Board's Final Rule Adopting Direct Decertification and Prohibiting Representation Applications for Two Years**

41. On January 31, 2019, the NMB issued a Notice of Proposed Rulemaking ("NPRM") proposing to amend its rules in relation to decertifying collective bargaining representatives. *See* 84 Fed. Reg. 612-14 (proposed Jan. 31, 2019) (to be codified at 29 C.F.R. pts. 1203 & 1206). On March 28, 2019, the Board conducted a "public hearing" where Board members heard oral presentations from interested parties but did not involve any questioning or taking of evidence. It also received written comments.

42. The TTD and various affiliates, as well as other unions, presented written comments, which together raised the issues presented in this action. Supplemental comments were also submitted based on the results of a Freedom of Information Act request.

43. On July 26, 2019, the Board issued its Final Rule. 48 Fed. Reg. 35977-89 (July 26, 2019) (to be codified in 29 C.F.R. pts. 1203 & 1206). The Board established a direct decertification election process under which an employee may file an application seeking decertification. The Final Rule thus permits an election based on an application "seeking decertification." 48 Fed. Reg. 35989 (July 26, 2019) (to be codified in 29 C.F.R. pt. 1203.2).

This approach is not permitted by the Act as written and is outside the Board's authority and jurisdiction.

44. Additionally, the Board adopted a two-year bar on applications seeking certification of a representative following a decertification. 48 Fed. Reg. 35989 (July 26, 2019) (to be codified in 29 C.F.R. pt. 1206.4(a)).

45. The Final Rule will provide additional avenues for rail and air carriers, as well as outside groups supported by employers (in this and other industries), to seek to influence or interfere with employees' choice of representatives. Even under the straw man procedure, carriers have been caught in the act of illegally supporting and directing efforts to oust duly elected representatives. *See Application of Mike A. McNeal*, 35 N.M.B. 213 (2008). Indeed, at the public hearing before the Board in this rulemaking Allegiant Air management described an employee who had sought decertification as "*our straw man*" and bemoaned the difficulty in educating employees on how to oust the elected union representative.

46. The Final Rule will incentivize carriers to further push the envelope in this regard, multiply the opportunities for such illegal conduct, and make it even more difficult for the Board to enforce the legal prohibition against carrier interference.

47. The Final Rule also doubles the length of time after an effective decertification that employees must wait before seeking representation again. Currently, there is a one-year bar after dismissal of an application whether through a "no-union" vote or otherwise. *See* 29 C.F.R. § 1206.4(b). The Final Rule expands that period to two full years. During such time, not only would employees be without a collective bargaining representative and without a collective bargaining agreement, but the employer would have two years to carry out efforts to deter and defeat any future representation.

48. Employers today spend millions of dollars to prevent unrepresented groups from becoming represented. These same employers will no doubt redouble their efforts in the two-year window opened by the Board's Final Rule.

49. There is no legitimate reason for this limitation on employees' statutory rights to organize. The two-year bar on applications following the certification of an organization furthers the statutory purposes of Section 2 of the Act by allowing the employer and the newly certified organization to engage in the lengthy process of negotiations under the Act and carry out the expressed wishes of employees. *See Nat'l R.R. Passenger Corp.,* 13 N.M.B. 412, 416 (1986).

50. The Board now asserts, without evidence, that "changes in the employer-employee relationship that occur when employees become represented … or become unrepresented require similar treatment." 48 Fed. Reg. 35978 (July 26, 2019) (to be codified in 29 C.F.R. pts. 1203 & 1206). No such evidence was presented at the public hearing, nor could it have been, because that claim makes no practical sense. The certification of a new representative imposes a complex set of legal obligations on carriers, employees, and representatives regarding both negotiations of agreements and their enforcement. Certification may ultimately lead to the involvement of the Board in the purposefully drawn out mediation process. A change to an unrepresented status does not impose any such obligations –it simply removes them. With decertification, there is no obligation to bargain; there is no administration or enforcement of a collective bargaining agreement; there is no role for the Board in mediation. There is no rational basis for a two-year bar in that circumstance.

51. The two-year bar would also have the truly unprecedented effect of prohibiting employee self-organization for a two-year period. The Board acknowledges that it has a "statutory mandate to protect employees' freedom to choose a representative." 84 Fed. Reg. 613

(proposed Jan. 31, 2019). The two-year bar runs directly contrary to that mandate. Once there is a loss of representation, employees will be forbidden from submitting applications seeking representation.

## CLAIMS FOR RELIEF

### COUNT I

### VIOLATION OF RLA SECTION 2, TWELFTH

52. Plaintiffs incorporate by reference paragraphs 1-51 as if restated herein.

53. The Administrative Procedure Act ("APA") provides that an agency's final action shall be "set aside" if it is "not in accordance with law." 5 U.S.C. § 706(2)(A).

54. In addition, under the RLA, this Court may vacate NMB action that is in excess of the Board's statutory authority. 5 U.S.C. § 706(2)(C).

55. The Board's Final Rule allowing a representation election based on an application seeking decertification violates Section 2, Twelfth of the RLA, 45 U.S.C. § 152, Twelfth.

### COUNT II

### VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT

56. Plaintiffs incorporate by reference paragraphs 1-51 as if restated herein.

57. The APA provides that an agency's final action must be "h[e]ld unlawful and set aside" if it is found to be "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2).

58. The Board's Final Rule allowing a direct decertification application, election, and the two-year bar on applications following such an election are unjustified repudiations of eight decades of past practice under the Act, contrary to the statutory language and legislative history, and are without factual basis or adequate justification. The Final Rule is arbitrary, capricious, and an abuse of discretion.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs prays for preliminary and permanent injunctions and declaratory relief against the National Mediation Board as follows:

a)  Declaring that the NMB's Final Rule is invalid because it is in excess of the Board's statutory authority under, and is contrary to, the RLA;

b)  Declaring that the NMB's Final Rule is invalid because it is arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law under the APA;

c)  Preliminarily and permanently enjoining the NMB from implementing the Final Rule;

d)  Awarding costs, expenses, and fees incurred in this litigation; and

e)  Ordering such other and further relief as the Court may deem just and proper.


Dated: October 16, 2019                              Respectfully submitted,

/s/ *Jeffrey A. Bartos*
Jeffrey A. Bartos
Bar No. 435832
Antonia Bird
Bar No. MD0066
Guerrieri, Bartos & Roma, PC
1900 M Street, N.W., Suite 700
Washington, D.C. 20036
202-624-7400
202-624-7420 (Fax)
jbartos@geclaw.com
abird@geclaw.com

*Attorneys for Plaintiffs*